UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELLEN KANITZ,

   Plaintiff,

v.

   Case Number 03-10180
   Honorable David M. Lawson

M. COOKE, CORRECTIONS OFFICER
OSBORNE, and M. FREY,

   Defendants.

   CONSOLIDATED CASES

-and-

GORDON M. BUTLER,

   Plaintiff,

   Case Number 03-10322

v.

M. COOKE, CORRECTIONS OFFICER
OSBORNE, and M. FREY,

   Defendants.
_____/

**OPINION AND ORDER ADOPTING IN PART MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION, OVERRULING DEFENDANTS' OBJECTIONS
TO REPORT AND RECOMMENDATION, GRANTING IN PART AND DENYING
IN PART DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT,
WITHDRAWING REFERENCE, AND SETTING STATUS CONFERENCE DATE**

   This matter is before the Court on objections to a report filed by Magistrate Judge Charles E. Binder, acting under a general order of reference to conduct all pretrial matters, recommending that the Court grant the defendants' second motion for summary judgment with respect to the plaintiffs' claim that they were deprived of procedural due process and deny the motion with respect to the other counts of the complaint. The plaintiffs did not object to the recommendation, but the defendants filed timely objections, and the matter is before the Court for a *de novo* review.

The Court finds that the defendants' objections lack merit, material fact issues preclude summary judgment on all but the due process count of the complaint, and the defendants are not entitled to qualified immunity since the facts taken in the light most favorable to the plaintiffs establish that the defendants knowingly deprived the plaintiffs of a constitutional right that was clearly established at the time. The Court, therefore, will overrule the defendants' objections, adopt in part the report and recommendation, and deny the defendants' second motion for summary judgment. Because there are no further pending motions and the case appears to be ready for trial, the Court will schedule a status conference to establish additional case management dates.

I.

The Court discussed the facts at length in a previous opinion, *see* Op. and Order on First Mot. for Summ. J. [dkt # 43], and the parties agree that recitation remains accurate. Only a brief summary is required here.

This dispute arose from a contact prison visit by plaintiff Ellen Kanitz to inmate and co-plaintiff Gordon Butler. During the visit, the plaintiffs claim, corrections officer Mary Cooke entered the visiting room and exclaimed loudly enough for everyone to hear, "That's it, your visitation is terminated, you are on tape rubbing the prisoner's crotch with your hand, your visitation is terminated immediately[.]" Kanitz Am. Compl. at 4. The plaintiffs protested, but Kanitz's visit ended when Sergeant Reed Osborne, another corrections officer, supported Cooke's version of events.

Subsequent hearings resulted in the termination of Kanitz's visitation privileges and disciplinary action against Butler. Prison officials considered the video tape and concluded that it confirmed a violation of the rule prohibiting sexual contact during prison visits, but neither Kanitz

nor Butler were allowed to see the tape. After the unfavorable outcome of the administrative proceedings, Kanitz's letter-writing campaign provoked the involvement of the Office of Legislative Corrections Ombudsman. The investigator assigned to look into the matter reviewed the reports and the videotape and filed a report of her own, which stated:

> The video shows . . . [t]he visitor's hand draped over Butler's leg, not his crotch. Butler then takes her hand and their hands are together <u>between his knees</u>. Their hands are nowhere near his crotch.
>
> The video does not support Sgt Osborne's description at 1130 hours when he began recording.
>
> The video does not support the hearing officer's statement.
>
> Ms. Kanitz' hand appears to be relaxed on Butler's leg in the video while the couple is engaged in a conversation, putting into further question Sgt Osborne and Officer Cooke's statements.
>
> For these reasons, I recommend your consideration for rehearing and dismissal of the misconduct and dismissal of the visitor restriction.

Kanitz Am. Compl., Ex. 11, Lawrie Report (emphasis in original).

Thereafter, Butler's sexual misconduct violation and Kanitz's visitor restriction were overturned, and references to the incident subsequently were expunged from Butler's record. However, Kanitz and Butler have maintained all along that the conduct of the prison personnel was motivated by racial animus because Kanitz is white and Butler is black. On August 12, 2003, Kanitz filed a complaint in this Court, and Butler followed suit on November 11, 2003. The plaintiffs initially appeared *pro se*, but *pro bono* counsel was appointed and the plaintiffs presently are represented by an attorney. Both complaints allege violations of civil rights under 42 U.S.C. §§ 1981, 1983, and 1985, as well as state-law torts. Because the claims are substantially similar, the Court consolidated the matters on August 4, 2004.

On August 4, 2004, after consolidating the cases filed by Butler and Kanitz, the Court referred the actions to Magistrate Judge Charles E. Binder for general case management. Before the cases were consolidated, however, the defendants filed a motion to dismiss and for summary judgment with respect to Kanitz and for summary judgment with respect to Butler. On May 5, 2005, the magistrate judge filed a report and recommendation addressing these motions. Therein, he recommended that the defendants' motion be denied without prejudice with respect to Kanitz and granted in part and denied in part with respect to Butler. The magistrate judge recommended that officer T. Craig be dismissed as a party, but that the case proceed on all other grounds.

On November 22, 2005, the Court issued an opinion adopting in part the magistrate judge's report and recommendation. Op. and Order on First Mot. for Summ. J. [dkt # 43]. The Court agreed with Magistrate Judge Binder that summary judgment was inappropriate as to many of the plaintiffs' claims, and further agreed that officer Craig should no longer be a defendant in the case. However, the Court went one step further, ruling that the plaintiffs had identified insufficient proof of warden White's participation in the alleged conspiracy. In the end, therefore, the Court denied the defendants' motions for summary judgment in part, but dismissed Craig and White from the case.

The defendants were not deterred, however. Following additional discovery, they filed a second motion for summary judgment, again seeking dismissal of the entire case. The plaintiffs opposed the motion, and Magistrate Judge Binder issued a report and recommendation on March 5, 2008. R & R on Sec. Mot. for Summ. J. [dkt # 96]. Unsurprisingly, Judge Binder suggested that jury questions remained as to the majority of the plaintiffs' case, since most of the facts discussed previously by the Court were substantiated through discovery and were made part of the record.

However, he did recommend that the Court grant summary judgment in favor of the defendants on the plaintiffs' due process claim.  On March 19, 2008, the defendants filed timely objections.

The defendants' arguments in their second motion for summary judgment tread over much of the same ground surveyed in the first dispositive motions, which were filed before much discovery had taken place.  The legal issues were thoroughly discussed in the previous opinion and, as with the fact summary, will not be repeated here.  In issuing his latest report, Judge Binder generally followed those conclusions and analysis (although he did suggest that there was insufficient evidence to support the plaintiffs' due process claim).  However, his determinations were not foregone conclusions; the parties had conducted discovery in the meantime which would shed greater light on the viability of the plaintiffs' claims.  Among other things, the plaintiffs memorialized their allegations in sworn deposition testimony.

Butler testified that there was no sexual misconduct, and confirmed that the hearing officer would not allow him to view the videotape or seek a "witness statement" from officer Lapp, the officer that was in the room during the visitation, approximately "five feet away" from Butler and Kanitz.  Second Mot. for Summ. J., Ex. 5, Butler Dep. at 18-19.  Butler also stated his belief that officers Cooke and Osborne fabricated the charge because Butler and Kanitz "are an interracial couple."  *Id.* at 21.  Although Cooke didn't make any racial slurs at the time, Butler testified that she singled out the plaintiffs by rearranging the furniture in the visitation room so that they could be specially monitored.  *Id.* at 22-23.  Butler found this suspicious because "in the three and a half years that [he's] been there, [he's] never seen that done."  *Id.* at 23.  *See also ibid.* ("Here's another thing that was suspicious.  After we had moved, another couple came in behind us, and it was only two of them, and they were allowed to sit in the four-seater that we had just left, and they were not told

to move."). Butler said he didn't see any other interracial couples in the visiting room at the time, although he conceded that interracial couples were not uncommon. *Id.* at 25. Nevertheless, Butler insisted that he was treated differently than white inmates involved in same-race relationships:

> I didn't realize that I was treated differently until I saw other prisoners in the visiting room, both white and black. I noticed that in cases similar to mine, a white officer will come and give a warning to white inmates, "Hey, your hand is a little close to her back side," or "Don't hug so close," or "Don't rub her back, that's going to get you put out." But in the same circumstances, black inmates would be regularly terminated for the same thing, even where there hasn't been an established misconduct. So there's a pattern that I witnessed, and that a number of other inmates witness and been subjected to. That's what made me realize that in this case, in my particular case, there was some discrimination.

Pls.' Resp. Br., Ex. A, Butler Dep. at 35-36. Butler also testified that, due to the notoriety he had achieved for beating the sexual misconduct charge, approximately a dozen other inmates came to him with complaints concerning their treatment as members of interracial couples. *Id.* at 49.

Plaintiff Ellen Kanitz echoed Butler's representation that the two did not engage in sexual touching. *See* Pls.' Resp., Ex. B, Kanitz Dep. at 19 ("The first false statement is that they saw me rubbing his crotch. And the second, that it's on the video."). She further agreed that the guards' movement of the furniture, as well as officer Cooke's rude behavior, bespoke intentionality:

> Q. And you say that this was purposeful on their part. What evidence do you have that it was purposeful?
> A. I believe it was that I was targeted because of Mary Cooke being out in the visiting room when I was registering, knowing that I had never visited a prison. Again, having the furniture moved, being put under a camera and her barging out of the room that most corrections officers don't come out that way, now that I've been there. And being so unprofessional that not only could we hear it, everybody else could hear, too. It was embarrassing and humiliating.

*Id.* at 19-20. As Kanitz had earlier explained, Cook told her loudly in front of others that she "was on tape rubbing his crotch." *Id.* at 19. Kanitz professed her belief that she and Butler were targeted

-6-

because they were an interracial couple. *Id.* at 21-22. However, when questioned whether she had any evidence to suggest Cook and Osborne discussed the matter beforehand, Kanitz said she did not, although she "believe[s] they did" based on the circumstances. *Id.* at 22. Kanitz also contrasted her treatment with that accorded to other couples:

> Q. Now, you've mentioned that you've observed some things after this incident that concerned you. Can you give me a couple of examples?
> A. Concerning other people in the visiting room?
> Q. Yes.
> A. I've seen other couples warned about inappropriate behavior. I've seen it done in a different way.
> Q. What way?
> A. Usually, like I said, they call from behind and the officer answers the phone. He looks out to see who they're talking about and he usually motions the inmate to come up to his desk. And then he tells them whatever they said in the back. And I've never seen anybody leave, they just went back and sat down.
> . . .
> Q. And what kind of behavior are we talking about?
> A. The behavior that I remember is a hand being too close to a breast and a hand being too close on a leg. And I also saw some behaviors that were never monitored, also.
> Q. Such as?
> A. There was a white couple in front of us where the guy gave the woman a hickey on her neck and no one noticed.

*Id.* at 24-26. Finally, regarding her due process claim, Kanitz testified that hearing officer Craig denied her access to written statements and the video, despite the fact that hearing investigator Frey told her twice that she could see the video when she attended the hearing. *Id.* at 28.

To support their allegations of racial discrimination, the plaintiffs have furnished affidavits from three other inmates at the Parnall Correctional Facility who claim they experienced such treatment. The least probative of these statements comes form Keith Lynn. He simply states: "During my participation in the Educational Programs at the Levin School, which is located on the grounds of Parnall Correctional Facility in Jackson, Michigan, Correctional Officer Mary Cooke,

in her position as 'Primary School Officer,' did demonstrate [i]ndifference[] and[] [r]acial [d]iscrimination toward myself, as well as other [b]lack [i]nmates." Pls.' Resp. Br., Ex. C, Lynn Aff. The affidavit of Nathan Bridges is only slightly more helpful. Bridges, an African-American male, represents that he has been subjected to racial discrimination in the visiting room resulting in two wrongful "major misconduct tickets." Pls.' Resp. Br., Ex. C, Bridges Aff. at 1. He says that he can "provide proof" of this discrimination, but his testimony is speculative. *See ibid.* (stating merely that "[t]here is clearly a difference between the way black and white inmates are treated when it comes to misconduct tickets and disciplinary action"). On the other hand, inmate Barry Porter tells a story of discriminatory treatment that closely parallels that allegedly suffered by the plaintiffs. He writes:

> I was falsely accused of sexual misconduct at Parnall Correctional Facility. This incident occurred as myself and my visitor, a white female . . . , were about to take a photo. [O]fficers stated that I purposefully touched her breast. [I]t has been my position that this action was not intentional. I feel strongly that we were targeted because I am black and she . . . is a white female.

Pls.' Resp. Br., Ex. C, Porter Aff.

There is now little dispute that the videotape does not in fact support the allegation of sexual misconduct, despite the defendants' claims that it showed sexual touching and established the alleged violations. *See, e.g.,* Pls.' Resp. Br., Ex. D, Stapleton Dep. ("Q. Do you recall your decision was to overturn the sexual misconduct charge against Mr. Butler? A. Yes, I do. Q. Why did you make that decision? A. . . . because the hearing report itself made reference to the decision being based in part on – on the video. I didn't believe the video itself to support the hearing decision."). However, the defendants now have offered an explanation for this: the VCR wasn't recording when the misconduct occurred, but was only turned on after the fact. *See* Br. in Supp. of Sec. Mot. for

Summ. J. at 1-3. It appears this is the first time the defendants have advanced this theory, rooted as it is in deposition testimony elicited in August 2006.

The defendants' version of events all along has been that officer Cooke observed what she believed was sexual misconduct, and she then sought confirmation from officer Osborne. However, according to Osborne, the VCR was not yet recording when he arrived at the monitor and observed the violation. Br. in Supp., Ex. 1, Osborne Dep. at 48, 50. Osborne explained that this was not that unusual since "we don't record everything that goes on in there. If we see something, then we turn the VCR on and begin recording." *Id.* at 49. Only a brief moment elapsed from the time Cooke called for Osborne and the time he arrived, because Osborne was "not more than a couple of feet" from Cooke. *See ibid.* Likewise, it appears that it did not take long to get the VCR recording. As Osborne explained, "It seems to me the tape was inserted in the deck, I had to push it in. You know, the tape was in the door. All I had to [do] was push it in and hit the record button, because when you push it in, I think the tape turns the VCR on automatically." *Id.* at 50. On the other hand, Osborne conceded that Cooke probably erred in failing to record as soon as she perceived a violation. *See id.* at 51 ("Q. If she observed a violation taking place, shouldn't she have recorded it? A. Well, I guess you could say that.").

In their second summary judgment motion, the defendants contend that there is no direct evidence of racial animus, which must be proved to establish an equal protection violation. Judge Binder rejected this argument as unsupported by precedent. He found that the plaintiffs proved a circumstantial case for discrimination by applying the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The defendants also argued that no due process claim was made out, a proposition that Judge Binder accepted. The defendants next argued that there was

insufficient proof of a conspiracy, but that argument was largely dependent on the success of the defendants' attack on the equal protection claim. Judge Binder recommended that argument be turned back. Finally, the defendants contended that they are entitled to qualified immunity. However, Judge Binder found that the plaintiffs' rights under the Equal Protection Clause were clearly established at the time and the defendants' conduct, viewed in the light most favorable to the plaintiffs, was objectively unreasonable. As noted, the defendants filed timely objections.

II.

Objections to a report and recommendation are reviewed *de novo*. 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). "'[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings . . . believed [to be] in error' are too general." *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

The motion in this case is for summary judgment. A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The magistrate judge discussed this standard in detail and the parties do not dispute the accuracy of his discussion, which the Court accepts.

As noted, the plaintiffs did not object to the magistrate judge's conclusion that the due process claim should be dismissed. Therefore, the Court may and does adopt the report and recommendation as to that ruling. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985) (holding that the failure to object to the magistrate judge's report releases the Court from its duty to independently review the motion); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

The defendants, on the other hand, advance four objections. First, they argue that the magistrate judge erred by considering deposition and affidavit testimony that alleged racial by MDOC personnel other than the defendants, including the testimony of Barry Porter and the plaintiffs insofar as it concerned discriminatory acts by other officers. Although they do not cite any law, it appears that the defendants object on grounds of relevancy. "Under Fed. R. Civ. P. 56(e), evidence submitted in opposition to a motion for summary judgment must be admissible. *See, e.g., Monks v. Gen. Elec. Co.*, 919 F.2d 1189, 1192 (6th Cir. 1990). Hearsay evidence, as well as evidence that is irrelevant, must be disregarded. *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991)." *U. S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

The Court finds that the magistrate judge properly considered the testimony of the plaintiffs and Barry Porter regarding evidence of discrimination by other officers because the plaintiffs pleaded a pattern-or-practice theory. It is true that the statements made by the plaintiffs and Porter concerned evidence of racial discrimination by officers other than defendants Cooke, Osborne, and

Frey. However, this evidence is relevant to the conduct of the defendants because it tends to show an overarching policy of discrimination at the facility. The plaintiffs' equal protection claim is based on disparate treatment, and Title VII precedent is therefore instructive. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (explaining that proving intentional discrimination for an equal protection claim brought under § 1983 requires the plaintiff to make the same showing required under Title VII). In *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004), the Sixth Circuit noted that pattern and practice evidence is the conventional method of establishing a disperate *impact* claim, and it is insufficient by itself to establish disperate *treatment*. *Id.* at 575 (noting that "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs"). However, the court also held that "pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment." *Ibid.* The plaintiffs in this case alleged that the defendants "executed and/or implemented an official municipal policy, practice, custom, and/or usage" which deprived the plaintiffs of their Constitutional rights. *See* Kanitz Amend. Compl. at ¶ 36. Particularly in light of the fact that the plaintiffs filed their case *pro se*, these pleadings are sufficient to show the plaintiffs intended to argue that the defendants' acts were emblematic of a larger pattern or practice. Given the nature of the plaintiffs' theory, evidence that other corrections officers discriminated against mixed-race couples is relevant to the claims of similar discrimination by defendants Cooke, Osborne, and Frey. The situation is somewhat akin to the facts in *Robinson v. Runyon*, 149 F.3d 507, 513-14 (6th Cir. 1999), where the court held that evidence of racist behavior towards other employees was probative of the plaintiff's race-based discrimination claim. The defendants' first objection is overruled.

The defendants also object to the magistrate judge's qualified immunity analysis. They premise this objection on the following remarks made by Judge Binder, which they believe demonstrate a lack of clarity in the identified equal protection rights:

> There is some confusion whether a prisoner needs to allege deprivation of a protected interest in addition to his claim that he was treated unequally. Some courts have held that even where a plaintiff lacks a life, liberty, or property interest, he may bring an equal protection claim. *Garcia*, *supra*; *Troxel v. DeWalt*, No. 06-CV-273-KSF, 2007 WL 196894, *2 (E.D. Ky. Jan. 23, 2007) (addressing equal protection claim after finding no liberty interest in plaintiff's prison job); *Skibbe v. Michigan Dep't of Corrections*, No. 1:05-CV-175, 2006 WL 625869, *4 (W.D. Mich. Mar. 9, 2006) (addressing equal protection claim after finding plaintiff had no liberty interest in prisoner classification) . . . . At other times, courts appear to require plaintiff show the presence of a protected interest before challenging the equality of the state's individual provision of that protected interest. *E.g., Haynes v. Hudson*, 899 F.2d 1221 (Table) (6th Cir. Apr. 10, 1990) (upholding dismissal of complaint as frivolous where plaintiff alleged violation of his due process and equal protection rights because there is no constitutional right to parole nor had Michigan created a liberty interest in parole without distinguishing between due process and equal protection claims).

R & R at 14. After identifying this split in authority, Judge Binder suggested that he need not resolve it but then, in the same sentence, he basically went on to do just that. *See id.* at 15 ("Since resolution of this legal issue is beyond this Report's scope, I thus suggest that under this framework, Plaintiff's [sic] claim of a violation of equal protection may proceed even absent a protected interest in visitation."). Based on the legal ambiguity identified by Judge Binder, the defendants posit that they are entitled to qualified immunity because the equal protection right violated is not clearly established.

Qualified immunity is an affirmative defense that protects officers from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Tucker v. City of Richmond, Ky.*, 388 F.3d 216,

219 (6th Cir. 2004). If Judge Binder were correct, it would follow that the defendants are entitled to qualified immunity since the plaintiffs' claim would be grounded in a violation of a constitutional right that is not clearly settled. However, the defendants' argument evaporates when the matter is analyzed properly.

The plaintiffs' *have* alleged violation of a clearly established constitutional right – the right to be free from disparate treatment based on their status as a mixed-race couple. The Equal Protection Clause ultimately aims "to do away with all governmentally imposed discrimination based on race," *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (citation and footnote omitted), because "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). The Supreme Court has dismissed the idea that a racial classification which burdens races equally is any less odious under the Equal Protection Clause. In *Loving v. Virginia*, 388 U.S. 1 (1967), decided over 40 years ago, the Court struck down a Virginia statute criminalizing interracial marriages. The Court rejected the idea that the miscegenation statute did not discriminate on the basis of race because it "punish[ed] equally both the white and the Negro participants in an interracial marriage." *Id.* at 8. As the Court put it: "[W]e deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." *Id.* at 9. *See also Tetro v. Elliott Popham Pontiac*, 173 F.3d 988, 994-95 (6th Cir. 1999) (upholding Title VII action for discrimination due to birth of mixed-race child and approving rule that Title VII protects against discrimination based upon interracial marriage or association). When a suspect classification is involved, the disparate

treatment need not affect a fundamental right. *See FCC v. Beach Comm'n, Inc.*, 508 U.S. 307, 313 (1993); *Hodel v. Indiana*, 452 U.S. 314, 331 (1981) ("Social and economic legislation . . . that does not employ suspect classifications *or* intrude on fundamental rights must be upheld against equal protection attacks so long as the legislative means are rationally related to a legitimate government purpose.") (emphasis added). So it does not matter whether the plaintiffs had a fundamental right to share each other's company while one of them was in prison; they had a constitutional right to be free from unequal treatment based upon their races. Judge Binder suggested confusion where there is none. The harm alleged by the plaintiffs – unequal treatment according to a race-based classification – implicates clearly established constitutional rights. Properly understood, there is no ambiguity which may give rise to qualified immunity. The defendants' objection is therefore overruled.

Next, the defendants object to the magistrate judge's conclusion regarding the conspiracy claim. Their objection here is a product of their more fundamental objection to the finding that the plaintiffs' equal protection claim can survive summary judgment; they believe the plaintiffs cannot proceed with their conspiracy claim because there was no predicate constitutional violation. Having overruled these objections, the defendants' objection relating to the conspiracy claims becomes an easy task. Since there must be a predicate constitutional violation to support a claim of conspiracy under 42 U.S.C. § 1985, *Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 226 (6th Cir. 1991), the defendants observe that the conspiracy claims must fail if the Court sustains their objections concerning equal protection. Because those objections have no merit, the present objection necessarily fails as well.

Lastly, the defendants object to the magistrate judge's recommendation regarding the state-law claims. Their point here is not so much an objection as it is an observation: if the Court finds that the plaintiffs cannot proceed on their federal claims, it can then decline the exercise of supplemental jurisdiction. Because the Court agrees with the magistrate judge that the defendants are not entitled to summary judgment on these federal claims, the Court will continue to exercise its supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. The defendants' final objection is overruled.

### III.

The Court will overrule the defendants' objections to the magistrate judge's report and recommendation and adopt the recommendation. After conducting a *de novo* review, the Court is satisfied that the defendants' motions against plaintiffs Kanitz and Bulter should be denied, except with respect to the due process claim.

Accordingly it is **ORDERED** that the magistrate judge's report and recommendation [03-10180 dkt #96] is **ADOPTED IN PART**.

It is further **ORDERED** that defendants' motions for summary judgment [03-10180 dkt #84; 03-10322 dkt #79] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the part of the amended complaint alleging a violation of the Due Process Clause is **DISMISSED**. The remaining claims will proceed to trial.

It is further **ORDERED** that the counsel for the parties shall appear for a status conference

on **June 3, 2008** at **2:30 p.m.** to establish final case management dates.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: May 23, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 23, 2008.

s/Felicia M. Moses
FELICIA M. MOSES